IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CHESTER RONEY,
Individually and as Executor of the
Estate of Henry Clay Roney, Jr.,

        Plaintiff,

v.                                    CIVIL ACTION NO. 3:05-0788

GENCORP, et al.

        Defendants.

**MEMORANDUM OPINION AND ORDER**

This case involves the untimely death of Henry Roney, Plaintiff's father. From 1965 until 1982, Mr. Roney worked at the Pantasote Corporation/Gencorp Inc. Polyvinyl Chloride plant in Point Pleasant, West Virginia. There, he worked extensively with vinyl chloride monomer ("VCM") – the major raw component of Polyvinyl Chloride ("PVC"). VCM is now associated with the particular form of liver cancer – angiosarcoma – to which Mr. Roney succumbed. Mr. Roney's son and his estate have filed suit against the defendants for failure to disclose their full knowledge of the danger of VCM and for failing to warn Mr. Roney of its hazardous nature.

In defense of the failure to warn claim, the main product supplier, PPG Industries, has asserted that it had no duty to warn because that duty was obviated by the employer's own duty to warn. Such a defense, most commonly referred to as a "sophisticated user" defense, is available in many states but has not been explicitly adopted or rejected in West Virginia. Because this Court has jurisdiction through the parties' diversity of citizenship, it is required to apply the substantive law

of West Virginia. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). When approached with an issue, such as the one described above, not yet addressed by the state supreme court, this Court must offer its best judgment about what the West Virginia courts would do if faced with the questions. *Food Lion Inc. v. Capital Cities/ABC, Inc.* 194 F.3d 505 (4th Cir. 1999).

## Discussion

Products liability cases in West Virginia fall into three broad categories: "design defectiveness; structural defectiveness; and use defectiveness arising out of the lack of, or adequacy of, warnings, instructions, and labels." *Morningstar v. Black & Decker Mfg. Co.*, 253 S.E.2d 666, 682 (1979). "Use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." *Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603, 609 (W.Va. 1983). Here, the plaintiff makes no argument that VCM was inherently defective, thus, his claim falls within the third category – use defectiveness as a result of a failure to warn. Defendant PPG argues that it had no duty to warn with three different but closely associated legal arguments: 1) the open and obvious exception; 2) the sophisticated user defense; 3) the bulk supplier defense. Each of these theories is addressed in the following sections. As explained below, the open and obvious exception is inapplicable to the facts at hand, but the sophisticated user and bulk supplier defenses, both rooted in the Restatement of Torts, would be adopted and applied by the West Virginia courts.

### I. The Open and Obvious Exception

PPG first attempts to obviate any duty to warn through the assertion of the open and obvious exception to the duty to warn. This exception is well established in the context of an owner or

occupant's duty to warn invitees of hazards on their premises. *See Estate of Helmick by Fox v. Martin,* 453 S.E.2d 335, 339 (W.Va. 1994). In *Estate of Helmick*, the court explained, "There is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant." *Id.*

The open and obvious exception in the context of product liability was considered by a federal court from this district sitting in diversity. *See Wilson v. Brown and Williamson Tobacco Corporation*, 968 F.Supp. 296 (S.D. W.Va. 1997). In that case, Judge Haden (chief judge at the time) acknowledged that West Virginia recognized the open and obvious exception in premise liability cases (citing *Cazad v. Chesapeake & Oh. R.R. Co.,* 622 F.2d 72 (4th Cir. 1980)) and cited a general tort principle for the proposition that there is no duty to warn of obvious dangers present in products. *Wilson*, 968 F.Supp. at 301 (citing W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* 686 (5th Ed. 1984). Judge Haden implied that the doctrine would be available to the defendant but found that facts in the case were not developed enough to support it. *Id.* The *Wilson* case was a product liability suit against a tobacco company for not fully disclosing the hazards of loose tobacco. *See generally, id.* Discovery had not progressed to a point where the court could determine whether the hazards of tobacco use were well known enough at the time of the plaintiff's use to make them "open and obvious." *Id.* at 301.

This Court is in agreement with Judge Haden's conclusion in *Wilson*, that West Virginia would adopt the open and obvious exception to a duty to warn in the products liability context. It must, however, find that the exception is not available on the facts of this case. The connection between cancer and tobacco use is universally understood in this country. It is the subject of countless publicity campaigns, commonly referenced in the media, and drilled into children from

3

an early age. The same cannot be said of the hazards of VCM. While its hazards may now be readily accepted in the scientific, medical, and industrial communities, and known throughout the workplace, at the time of exposure it could not be considered an "open and obvious danger." Nor were the hazardous properties of VCM readily apparent from simple observation of the chemical, in the way of open and obvious hazards on premises. While it is possible that Mr. Roney's employer knew of the dangerous properties of VCM, such knowledge would come from that employer's specialized involvement in the industry – its sophistication. Consequently, while the sophisticated user and bulk supplier defenses may be available to PPG, it will not be permitted to assert that the dangers of VCM were so open and obvious as to alleviate its duty to warn.

## II.  The Sophisticated User Defense

Section 388 of the Restatement (Second) of Torts addresses a supplier's potential liability for a "Chattel Known to Be Dangerous for Intended Use." It proposes that liability will attach when such a supplier

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Rest. (2d) Torts § 388. Comment n of this section is commonly cited as the basis for the sophisticated user defense.[1] It explains,

---

[1] The Court is aware that some commentators and courts have found a different basis for the doctrine – in comment k of § 388. *See e.g. Taylor v. American Chemistry Council*, -- F.3d ----, 2009 WL 2357036 *4 - *6. (1st Cir. 2009). Defendants have argued, however, that the basis

4

> it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. There are, however, certain factors which are important in determining this question. There is necessarily some chance that information given to the third person will not be communicated by him to those who are to use the chattel. This chance varies with the circumstances existing at the time the chattel is turned over to the third person, or permission is given to him to allow others to use it. These circumstances include the known or knowable character of the third person and may also include the purpose for which the chattel is given. Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so.

Rest. 2d Torts § 388 cmt. n.

The West Virginia Supreme Court has cited § 388 comment n. with approval. *Ilosky v. Michelin Tire Corp*, 307 S.E.2d 603 (1983). *Ilosky* was a product liability dispute centered on the proper arrangement of tires. *Id* at 607- 08. The plaintiff in the case crashed her vehicle and attributed the injury to the placement of radial tires on the front axle and conventional tires on the rear axle. *Id.* There was testimony that this arrangement could lead to "oversteer" and contribute to a loss of control. *Id.* In a footnote, the court recognized that the duty to warn might be satisfied by warnings given to the product assembler (the garage that installed the tires) rather then Michelin,

---

for West Virginia's adoption of the sophisticated user defense would be comment n. Moreover, as explained more fully below, the caselaw from the Fourth Circuit Court of Appeals develops a version of the sophisticated user defense from comment n.

the product manufacturer. *Id.* 611 n. 8. The court explained,

> Where the ultimate use of the product claims that the 'defect' consists of a lack of adequate warnings or labels and the manufacturer can show that such warnings were given to the assembler and that the assembler utilized the component against the manufacturer's warnings, liability should fall on the assembler rather than the manufacturer.

*Id.* (citing Rest. 2d Torts § 388 cmt. n). The issue, however, had not been raised and was thus not decided upon the facts. *Id.*

More recently, the West Virginia Supreme Court has rejected a defense similar to the sophisticated user defense. *See State ex Rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899 (W.Va. 2007) ("*Karl*"). In *Karl*, the court considered whether to adopt the learned intermediary doctrine – a doctrine which would absolve drug manufacturers from liability for failure to warn of a pharmaceutical's dangers if adequate warnings were provided to a patient's physician. *Id.* After examining the history of the doctrine and the state of the pharmaceutical industry, the court decided not to adopt it. *Id.* Central to the reasoning was the fact that drug companies now engage in extensive direct-to-consumer advertising. *Id.* The court explained, "[w]hen the learned intermediary doctrine was developed, direct-to-consumer advertising of prescription drugs was utterly unknown." *Id.* at 907. The court then went on to explain changes in the industry,

> Since the early 1980's, direct-to-consumer advertising has boomed into a very profitable venture for pharmaceutical manufacturers. Yet, consumers' exposures to harm has increased as a result. They are surrounded by various prescription advertisements in all forms of print and broadcast media. Advertisements directed to consumers, however, often supply partial or incomplete information. Additionally, diagnosis by the consumer has resulted from these advertisements, as well as patient-demand

> for the brand-name drugs. *It is in the best interest of the general public that manufacturers have a duty to warn the ultimate user of side effects and risks.* Courts are increasingly motivated to protect the consumer, and require manufacturers to warn more than just the physician.

*Id.* (citing Olzem A Bordes, *the Learned Intermediary Doctrine and Direct-to-Consumer Advertising*, 81 U. Det. Mercy L. Rev 267, 274-75 (2004)) (emphasis in original).

While the *Ilosky* decision can hardly be considered an explicit adoption of the law stated in comment n of § 388, it is at the very least a signal that the court would be willing to consider it. Although the citation appeared in a footnote, and was stated as dicta, the court referenced it approvingly as a generally applicable principle. The decision in *Karl*, in contrast, was extremely context specific. The reasoning is not applicable to a scenario outside of the prescription pharmaceutical context and the rise of direct-to-consumer advertising. In deciding *Karl*, the court recognized that through such advertising pharmaceutical companies had gained direct access to patients, a relationship starkly different than that which had existed when the doctrine was developed – when patients received drug information exclusively through their doctors. *Id.* at 907. At the time of Mr. Roney's exposure, the PVC and VCM industries were much more like the early pharmaceutical industry described in *Karl*. Workers would have had little opportunity to influence the choice of products to which they would be exposed. Instead, they relied upon their employer to determine the scope of their duties and the production process. They were insulated from the manufacturer of the chemicals they used, much as the patient used to be insulated from the drug manufacturer. Because it was based on reasoning entirely inapplicable here, the *Karl* decision does not persuade the Court that West Virginia would refuse to accept any form of the sophisticated user defense. It does, however, counsel caution in adopting a version of the defense which could be

applied too broadly. It is the opinion of this Court, based in part on the supreme court's signal in *Ilosky,* that West Virginia would apply some version of the sophisticated user defense.

The Fourth Circuit Court of Appeals has had ample opportunity to explore the contours of comment n and its decisions offer strong guidance on how the provision would be applied in West Virginia. A trio of cases decided while the court of appeals sat in diversity applying Virginia substantive law are particularly persuasive. These opinions offer sound and logical consideration of the doctrine. While recognizing the adoption of comment n by Virginia courts, they focus not so much on Virginia case law, but on comment n itself. .

The first decision was in a lawsuit brought by employees of a Virginia foundry who had developed silicosis following workplace exposure to silica dust. *Goodbar v. Whitehead Brothers,* 591 F.Supp. 552 (W.D. Va. 1984) *aff'd by Beale v. Hardy*, 769 F.3d 213 (4th Cir. 1985) (adopting the opinion of the district court as its own). After recognizing that Virginia had adopted comment n, the court developed a balancing test to determine whether a supplier had a duty to warn independent from that of the employer. *Id.* at 557. These factors to be considered included,

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Id.* After examining Fourth Circuit case law on the duty to warn, the court articulated a more simplified standard, seemingly based on the fourth factor of the test, "if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier." *Id.* 561. The court explained further, "when the supplier has

reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated." *Id.* Reviewing the facts in the record, the *Goodbar* court concluded that there existed "a plethora of material" to show that the foundry had extensive knowledge of the dangers of silicosis." *Id.* Based on this knowledge and the difficulty of the defendant, as a bulk supplier, to issue a warning to employees, the court held that it was the responsibility of the foundry to communicate adequate warnings to its employees; a duty which relieved that of the supplier. *Id.* at 561-66.

During the same summer, the Fourth Circuit considered another Virginia case implicating comment n and the sophisticated user defense while sitting *en banc*. *Oman v. Johns-Manville Corp,* 764 F.2d 224 (4th Cir. 1985). Shipyard workers exposed to asbestos during the course of their careers brought *Oman*. The court considered the same factors and balancing test articulated by the *Goodbar* court to determine if the manufacturer owed a duty to warn. Finding that the sophisticated user defense could not be applied to the facts on the record, it concluded,

> In this case the product, because it contained asbestos fibers, was very dangerous. The burden on the manufacturers in placing a warning on the product was not great. The employer was unaware of the danger until 1964. Finally, once the employer became aware of the potential danger it failed to convey its knowledge to its employees.

*Id.* at 233.

A few years later the Fourth Circuit Court of Appeals applied the same balancing test in another case concerning asbestos exposure. *Willis v. Raymark Industries, Inc.* 905 F.2d 793 (4th Cir. 1990). In *Willis,* the defendant supplier tried to assert the sophisticated user defense on grounds that the plaintiffs' employer, DuPont, had extensive knowledge about the dangers of asbestos. *Id.*

9

The court determined that proof of extensive knowledge was not enough. *Id.* at 797 ("Celotex may not escape liability by reconstructing the past to show merely what the employer/purchaser knew."). The court explained, "Comment n clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer *prior to and during the time the workers were exposed.*" *Id.* (emphasis in original). It continued, "[t]he fact that an employer possesses knowledge of a product's dangers does not extinguish the manufacturer's liability unless the manufacturer can show that it had reason to believe that the employer was or would be acting to protect the employees." *Id.* Because the supplier made no showing, the defense could not be asserted. *Id.*

*Oman* and *Willis* require a different approach to the sophisticated user defense than the *Goodbar* court, and more closely tie the defense to the factors derived from comment n. While the *Goodbar* court allowed a post-hoc reconstruction of the employer's knowledge to satisfy the factual foundations of the defense, *Oman* and *Willis* require more. Under *Oman* and *Willis* the focus is not on the employer's knowledge, but rather the reasonableness of relying on the employer to generate or pass on warnings. Clearly, the knowledge of the employer is relevant to this inquiry. Proof of extensive knowledge alone, however, is not enough to support an assertion of the defense under *Oman* and *Willis*. The manufacturer must offer proof that it was a aware of the employer's sophistication and that this awareness translated into reasonable reliance.

The *Oman-Willis* articulation of the sophisticated user defense is firmly rooted in the provisions of the Restatement (Second) of Torts; it is only a narrow exception to the general duty of a manufacture to warn the ultimate user of the hazards of its products. As such, the Court now **FINDS** that West Virginia would allow an application of the sophisticated user defense as described

by the Fourth Circuit Court of Appeals in *Oman* and *Willis* and as a factor to be considered in applying comment n of § 388 of the Restatement (Second ) of Torts. At this time the Court declines to rule as to whether PPG has supplied sufficient evidence to form a factual basis for the defense.

### III.	The Bulk Supplier Defense

As with the sophisticated user defense, the bulk supplier is rooted in Restatement § 388 comment n. While the sophisticated user defense focuses on the reasonableness of reliance on the employer, the bulk user defense concerns the burden which would be imposed on the supplier if it were bound to directly warn all users. These are two of the six factors in the balancing test developed from comment n and repeated throughout Fourth Circuit case law.[2]

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*See e.g. Goodbar,* 591 F.Supp. at 557; *Oman*, 764 F.2d at 233; *Willis*, 905 F.2d at 797.

The status of the manufacturer as a bulk supplier, therefore is an independent factor that must be considered in applying comment n. The Court **FINDS** that West Virginia courts would adopt the

---

[2]As noted in footnote 1, some courts have found different bases for the sophisticated user defense and the bulk supplier defense – in § 388 comment k and § 388 comment n, respectively. There is no reason to suspect, however, that West Virginia would adopt a verison of the sophisticated user defense based in comment k rather than comment n. To the contrary, the only case the parties have provided in which the doctrine is referenced, *Ilosky*, cites to comment n. 307 S.E.2d at 611 n. 8. With this common foundation, there is logical support for consideration of the two defenses together, as companion factors informing the ultimate decision on whether the supplier bore a duty to warn. *See also,* Victor E. Schwartz & Christopher E. Appel, *Effective Communication of Warnings in the Workplace*, 73 Mo. L. Rev. 1, 19-22 (2008) (describing a trend in courts to apply the bulk supplier and sophisticated user defenses together).

bulk supplier defense, as well as the sophisticated user defense, in their application of comment n to § 388 of the Restatement (Second) of Torts. The Court will apply the bulk supplier defense in conjunction with other factors of the comment n test, as articulated by the Fourth Circuit Court of Appeals – including the question of whether reliance on the employer as a source of warnings was reasonable.

## Conclusion

For the reasons stated above, the Court **FINDS** that West Virginia courts would adopt the sophisticated user and bulk supplier defenses in their application of comment n to § 388 of the Restatement (Second) of Torts. The Court further **FINDS** the West Virginia law would not support and application of the open and obvious defense on the facts of this case.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: September 4, 2009

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE